**Larry A. BRACE, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. C 07–2074.**

United States District Court,
N.D. Iowa,
Eastern Division.

July 14, 2008.

Jerald L. Martin, Fulton Martin & Andres PC, Waterloo, IA, for Plaintiff.

Stephanie Johnson Wright, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

## ORDER ON JUDICIAL REVIEW

JON STUART SCOLES, United States Magistrate Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ................................................ 1066

II. *PRIOR PROCEEDINGS* .......................................... 1066

III. *PRINCIPLES OF REVIEW* ...................................... 1067

IV. *FACTS* ....................................................... 1068
 A. *Brace's Education and Employment Background* ......................... 1068
 B. *Administrative Hearing Testimony* ..................................... 1068
 1. *Brace's Testimony* ................................................ 1068
 2. *Vocational Expert's Testimony* ................................... 1071
 C. *Brace's Medical History* .............................................. 1072

V. *CONCLUSIONS OF LAW* ......................................... 1078
 A. *ALJ's Disability Determination* ........................................ 1078
 B. *Whether the ALJ Fully and Fairly Developed the Record* ................ 1079
 1. *The Opinions of Brace's Treating Physicians* ...................... 1079
 2. *Brace's RFC* ..................................................... 1082
 3. *Credibility Determination* ........................................ 1083

VI. *CONCLUSION* ................................................. 1084

VII. *ORDER* ...................................................... 1084

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Larry A. Brace on October 19, 2007, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Brace asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Brace requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On September 9, 2003, Brace applied for both disability insurance benefits and SSI benefits. In both applications, Brace alleged an inability to work since September 30, 2001, due to depressive disorder, migraine headaches, and chronic cirrhosis. Both applications were denied on November 20, 2003. On April 19, 2004, the applications were denied on reconsideration. On May 6, 2004, Brace requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 19, 2005, Brace appeared with counsel before ALJ John P. Johnson. Brace and voca-

tional expert Carma Mitchell testified at the hearing. In a decision dated August 25, 2006, the ALJ denied Brace's claim. The ALJ determined that Brace was not disabled and not entitled to disability insurance benefits and SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Brace appealed the ALJ's decision. On September 13, 2007, the Appeals Council denied Brace's request for review. Consequently, the ALJ's August 25, 2006 decision was adopted as the Commissioner's final decision.

On October 19, 2007, Brace filed this action for judicial review. The Commissioner filed an answer on December 20, 2007. On January 11, 2008, Brace filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that there is other work he can perform. On March 24, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. Brace filed a reply brief on April 17, 2008. On November 15, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter ... a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive ..." *Id.*

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir.2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir.2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir.2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir.2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a

whole." *Id.* (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir.1995)).

## IV. FACTS

### A. Brace's Education and Employment Background

Brace was born in 1959. He completed the eighth grade in school. He has earned a GED. At the hearing, Brace indicated that he had difficulty reading due to dyslexia. In addition to dyslexia, Brace also stated that he had extreme difficulty with remembering and understanding things he read. He further stated that he had difficulty spelling and had not written a letter in many years. According to Brace, he is able to do simple math, such as addition and subtraction.

The record contains a detailed earnings report for Brace. He worked for Nestle USA and Nestle USA–Beverage Division, Inc. from 1987 to 2001. His earning steadily increased from $15,553.16 in 1988, his first full year at Nestle USA, to $39,195.07 in 1996. In 1997, his earning began to decline. Brace earned $17,455.49 in 2001. He had no earnings in 2002. In 2003, he earned 1,288.00 at a cemetery, performing outdoor maintenance. He worked at the cemetery for two to three months. He has had no earnings since 2003.

### B. Administrative Hearing Testimony

#### 1. Brace's Testimony

At the administrative hearing, Brace's attorney questioned Brace about his previous employment. According to Brace, he last worked in 2003 as a caretaker for a cemetery. His job duties included mowing lawns, trimming trees, and helping maintain headstones. He testified that he could lift up to 100 pounds when he worked at the cemetery. According to Brace, he stopped working at the cemetery because his diabetes caused severe swelling in his feet, ankles, and lower legs and he began developing problems with boils. Brace testified that later he also developed swelling in his hands as a result of his diabetes. When asked to elaborate on the swelling, Brace testified that the swelling caused a burning and aching pain in his hands and legs. Brace also stated that working with his hands and standing and/or walking caused the swelling to become more severe.

Brace's attorney also asked Brace to discuss his incarceration from late 2001 through December 2002. Brace testified that he was convicted of manufacturing methamphetamine in 2001. He also testified that he used methamphetamine. According to Brace, he stopped using methamphetamine because of his incarceration[1].

Prior to his incarceration, Brace worked at Nestle USA. He performed several jobs while he was employed at Nestle USA. His job duties required him to lift over 100 pounds, enter information into a computer, and stand or walk for up to 12 hours each day. Brace explained that he left Nestle USA because:

A: Well, the—I, I—what's—how do I— I had an accident with the lift truck, and see at, at that time I was using meth, and this was a, a Monday, and I, I used meth that Friday night when we got off work, and after the accident I went in and tested. They, they had everybody that—any accident involvement, you'd go to the hospital and they,

---

[1]. Brace's attorney asked Brace:
 Q: How, how were you able to discontinue your use of the methamphetamines? Did you take treatment, or how did you do it?

A: Well, the—after being incarcerated, that, that, that really straightens you out . . .
*See* Administrative Record at 661.

they, they tested. Anyway, it come back positive for methamphetamine and so it's at that time then I started going to Pathways and every, everything was going fine, and getting everything straightened around—and I have a long history of migraines also—and one, one weekend I was going through my medicine cabinet and . . . I found a, a pill bottle up there and I had like two Tylenol 3's left in it. Anyway, so I, I took them without even thinking about it and I came back to work that, that Monday, then like the next day they called me back in the office and, and said that I had codeine in my system. I, I said well I—you know—I—they were prescribed pills, but they, they still considered them as a street drug[.] . . .

Q: And were you terminated then because of the codeine in your, in your system?

A: Because of the, because of the Tylenol 3's they forced me to resign.

(Administrative Record at 659–60.) When asked whether he could currently perform any of his previous jobs at Nestle USA, Brace answered that he could not do any of his previous work because of his medical conditions.

Brace's attorney next asked Brace discuss his bipolar disorder. Brace testified that he has mood swings and decreased energy as a result of the bipolar disorder. Brace also testified that he has suicidal thoughts and had attempted suicide in the past. Brace and his attorney had the following colloquy regarding his bipolar disorder:

Q: What is it about your bipolar condition, do you think, that would affect your ability to work?

A: Oh, I, I, I don't really know about, about the bipolar, if that, if that really prevent me from working or not, you know. I, I've had it for a number of years, and I, I've been dealing with it, but just, just everything else is compiled on top of it right now . . . .

Q: Has that condition gotten better or worse since you left work?

A: Oh, far—much worse, much worse.

Q: Is it harder for you to pay attention and concentrate now?

A: Yeah . . . .

Q: Is it hard for you to complete things that you start?

A: Extremely . . . .

Q: Do you get distracted easily?

A: Yeah. Yeah . . . .

Q: Do you have problems remembering?

A: Yeah.

Q: Things that happened a long time ago or a short time ago?

A: More, more short, short-term, I have a hard time with and long-term, I'm—it seems like I'm better with for some reason, but—

Q: How do you handle stress?

A: As best I can. I, I get little—you know, episodes where, where I go off on a tangent I guess, but I, I try—you know, that's—I think that's part of the bipolar there—you know, you go through mood swings and, and it's an up and it's a down, and if something irritates you and you're coming up on like an upswing or something like that, you can just—you can fly off the handle a little bit[.] . . .

Q: Do you get upset and angry easily?

A: Yeah.

(Administrative Record at 668–70.)

Brace's attorney also questioned Brace regarding his difficulties with headaches and fibromyalgia. Brace testified that he has headaches more often than he does not have them. According to Brace, he has severe headaches when he wakes up in the morning generally six out of seven days each week. He indicated that the headaches last anywhere from 20 minutes to "days and days and days." When asked about his fibromyalgia, Brace classified his pain as severe and extreme achiness in all of his muscles throughout his body. Brace further described his pain in his muscles as being "really, really bad. It's like if I reach back and just even touch my calf right now it's just like—it feels like you just got done running like 20 miles or something like that, you know how your muscles just ache."[2]

Brace's attorney also asked Brace about his functional capabilities. When asked how much he could lift, Brace answered "about 20 pounds." Brace testified that he could carry 20 pounds "a couple hundred" feet. Brace also testified that he could not do any repetitive lifting. He estimated that he could stand in one position for "maybe five minutes." He further estimated that he could sit for fifteen to twenty minutes before his back starts hurting. Brace also indicated that he could probably walk three to four blocks at one time. Brace testified that he also had difficulty stooping or bending. When asked whether heat effects him, Brace answered that heat causes him to get headaches.

When asked about his hobbies and daily activities, Brace testified that he no longer goes fishing, bowling, boating, mushroom hunting, shopping, or to the movies because of his medical problems. Brace lives in a trailer and receives help from his mother with cleaning, but is able to do his own cooking. He is also able to drive. Brace testified that he has extremely poor sleep at night. According to Brace, he sleeps for about sixty to ninety minutes at a time before waking up during the night. He also lays down or sleeps about half of the time between the hours of 8:00 a.m. and 5:00 p.m.

The ALJ also questioned Brace. The ALJ and Brace had the following colloquy regarding Brace leaving his job at the cemetery:

Q: Today you said that you left the cemetery job because of problems with your feet swelling and the, and the—developing the boils.

A: Yeah.

Q: In September of 2003, right after you stopped working there, you told the Social Security Administration that your job ended because of the dry conditions and there was no more mowing needed.

A: Yeah. . . . [My employer] needed me there, you know, I couldn't, I couldn't ride the mower with—I mean I had boils on my, my rear that were just—and there would be just one right after another, one right after another. And it would take like a month to three weeks at least, to get one down to where you could sit on it comfortable. . . .

(Administrative Record at 691.) The ALJ also asked Brace about his daily activities. Brace informed the ALJ that he bathes himself, goes to church weekly, and helps his mother with cleaning.

After the ALJ finished questioning Brace, Brace's attorney asked him some additional questions. Brace's attorney

---

**2.** *See* Administrative Record at 675.

asked him if would "prefer to be back working at Nestle's?" Brace responded:

A: Oh yeah. Yeah, yeah, I—I mean, I, I got skills. I'm, I'm not—I might have some mind problems, but I, I can out-work—well, about anybody I've ever worked with in my entire life. I'll out-perform them one way or the other. But I, I, I think I got good work ethics. . . .

Q: Would you like to be working?

A: I, I, I would just love to be working—so much, like I don't want to be here at all, you know. I really don't. But I, I, I need help. You know. I need, I need help. I don't know, I don't know what I'd do—I really don't.

(Administrative Record at 701–02.)

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who would be: (1) unable to lift more than 50 pounds, (2) able to routinely lift 25 pounds, (3) able to stand and/or walk for two hours out of an eight-hour workday, (4) able to sit for six hours in an eight-hour workday, and (5) able to occasionally bend, stoop, squat, kneel, crawl, and climb. The ALJ further noted that "[t]his individual should not work at unprotected heights or around hazardous moving machinery; [the individual] is able to do only simple, routine, repetitive work not requiring close attention to detail or use of independent judgment for decision-making; with only occasional contact with the public; [the individual] does require occasional supervision; [the individual] should not work at more than a regular pace . . . and . . . should not work at more than a mild to moderate level of stress." [3] The vocational expert testified that under

such limitations, Brace could not perform any of his past jobs or the full range of unskilled work. The vocational expert testified that Brace could, however, perform the following unskilled jobs: (1) surveillance monitor (200 positions in Iowa and 33,000 positions in the nation), (2) document preparer (650 positions in Iowa and 60,000 positions in the nation), and (3) addresser (300 positions in Iowa and 23,800 positions in the nation).

The ALJ provided the vocational expert with a second hypothetical with the following limitations:

[T]his individual could not lift more than 20 pounds; routinely lift 10 pounds; with standing of five minutes at a time; sitting of 15 to 20 minutes at a time; and walking two to three blocks at a time; with only occasional bending, stooping, squatting, kneeling, or crawling; this individual should not be exposed to excessive heat or humidity; [the individual] should not work at unprotected heights or around hazardous moving machinery; [the individual] is able to do only simple, routine, repetitive work that does not require constant close attention to detail or use of independent judgment for decision-making; [the individual] does require occasional supervision; [the individual] should not work at more than a regular pace or more than a mild to moderate level of stress.

(Administrative Record at 708.) The vocational expert testified that under such limitations, Brace could not perform any competitive full-time employment because of the combination of standing, sitting, and walking limitations. The vocational expert also opined that Brace's testimony that he spent half of his days laying down would

---

**3.** See Administrative Record at 706.

preclude full-time competitive employment.

### C. Brace's Medical History

On April 4, 2001, Brace was examined by Dr. Lynne O. Geweke, M.D., Director of the University of Iowa Hospitals and Clinics ("UIHC") Headache Clinic. Brace complained of daily headaches and electrical shock sensations. Dr. Geweke noted that Brace had had headaches since childhood and had not gone more than one or two days without a headache since December 2000. Brace informed Dr. Geweke that his headaches could last from one to seven days. Brace described his headaches to Dr. Geweke as follows:

> unilateral and ... worsened by movement; they can be accompanied by nausea, photophobia and phonophobia. They are typically located in the occiput and he uses very florid descriptions, stating that it feels like his head is blown off and he has to feel it to make sure it isn't.

(Administrative Record at 496.) Brace also described shock sensations moving from his head and neck through his fingers on both hands and his legs. Dr. Geweke noted that Brace had a very large work-up for his headache problems, including CT scans, MRI's, EEG, and blood work. All of the work-up, however, was benign. Upon examination, Dr. Geweke found that Brace was not in any great deal of pain and his memory and attention were reasonable. Dr. Geweke further found that his cranial nerve examination was unremarkable, and despite his complaints, Brace had no significant tenderness or stiffness of his cervical, occipital, or shoulder muscles. Dr. Geweke concluded that Brace had a strong psychiatric component to his headache problem because he was convinced that there was something physically wrong with him despite a large nega-

tive work-up. Dr. Geweke recommended inpatient headache treatment for Brace.

On May 5, 2003, Brace saw Dr. Jeffrey J. Sutton, M.D., with complaints of headaches, heartburn, and extremity pain. Specifically, Brace informed Dr. Sutton that he had headaches across the back of his head which were dull and achy, pain in his hands and feet, and swelling in his feet. Upon examination, Dr. Sutton found good range of motion in Brace's lower extremities and no cranial nerves problems. Dr. Sutton diagnosed Brace with muscle contraction and retention headaches, heartburn, lower extremity pain with possible swelling of an unknown etiology, and probable bipolar disorder given his medication. Dr. Sutton recommended Ibuprofen as treatment.

On October 23, 2003, Dr. Myrna Tashner, Ed.D., reviewed Brace's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for Brace. On the Psychiatric Review Technique assessment, Dr. Tashner diagnosed Brace with depressive disorder, bipolar disorder, and polysubstance dependency. Dr. Tashner determined that Brace had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Tashner determined that Brace was moderately limited in his ability to: understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others. Dr. Tashner described Brace's activities of daily living as follows:

> [Brace] lives alone, is able to care for his personal needs, can't sleep, is able to do household tasks but aches all over. He is able to prepare food and eats when he is hungry. He is able to shop independently, get to his medical [appointments], and drive. He cares for his pets. He is able to take his medication independently. He has no interests but watching tv and reading, and said he understands and remembers what [he] reads. He visits [with] his mom and denied difficulties going out in public. He said he got along very well [with] supervisors, coworkers and public. He said he sometimes has trouble concentrating and remembering, isn't bothered by change and is able to deal [with] stress. He sometimes has trouble completing tasks and pay[s] his bills [with] his mother's help....

(Administrative Record at 263.) Dr. Tashner concluded that Brace was capable of "understanding and remembering simple instruction[s], procedures and locations. He would have concentration, attention and pace for same [with] moderate restrictions when in pain." [4]

On November 12, 2003, Dr. Stephen Elliot, Ph.D., D.O., reviewed Brace's medical records and provided DDS with a physical RFC assessment. Dr. Elliot determined that Brace had no exertional limitations and could frequently climb, balance, stoop, kneel, crouch, and crawl. Dr. Elliot further found no manipulative, visual, communicative, or environmental limitations.

On January 26, 2004, Brace visited Dr. Gayathry Inamdar, M.D., complaining of "pain all over." Dr. Inamdar noted that Brace had generalized arthralgia in the lumbar spine, bilateral leg swelling, and shoulder and neck pain. Brace informed Dr. Inamdar that his pain was constant, achy, and a 9 out of 10 on a scale of 1 to 10. X-rays were normal except for spondylolysis at the L5 of Brace's lumbar spine. Dr. Inamdar diagnosed Brace with severe arthralgias, myofascial pain syndrome, bilateral leg pain, and degenerative joint disease at L5. Dr. Inamdar prescribed a Duragesic patch for pain control. Dr. Inamdar also administered two caudal epidural steroid injections for pain relief in February 2004.

On April 6, 2004, Brace was examined by Dr. Basem Hamid, M.D., for leg and foot pain. Brace explained his symptoms to Dr. Hamid as follows:

> [Brace] states that 7 months previously he had awoken with bilateral ankle and feet swelling. This swelling would be intermittent and over time would progress pain in the metatarsal heads on both of his feet. With time the pain he stated which was sharp and aching progressed up to his calf and to his quadriceps ... and then into his low back.

(Administrative Record at 449.) Brace's physical examination was unremarkable. Dr. Hamid diagnosed Brace with chronic pain syndrome of unknown etiology. Dr. Hamid prescribed Relafen and Nortiptyline as treatment. Dr. Hamid also recommended aqua therapy with physical therapy.

On April 13, 2004, Dr. John A. May, M.D., reviewed Brace's medical records and provided DDS with a physical RFC assessment. Dr. May determined that Brace could: (1) Occasionally lift and/or

---

4. *See* Administrative Record at 263.

carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. May found no postural, manipulative, visual, communicative, or environmental limitations. Dr. May concluded that "the diagnosis of liver disease and varices now established and also the presence of some possible spondylolysis of L5, some limitation of lifting now appears appropriate, and [Brace] is felt capable of the RFC as outlined."[5]

On June 25, 2004, Brace met with Dr. Amy Stockman, Ph.D., for pain coping strategies. Brace informed Dr. Stockman that his pain when sitting was a 3.5 on a 10-point scale. According to Brace, at its worst, his pain was a 10 out of 10. Brace indicated that his main coping strategy was to lie down and try to sleep or watch T.V. Dr. Stockman formulated the following impression of Brace's difficulty with pain management:

> [Brace] has a difficult time engaging in much pain management. At this time, he states that any activity immediately makes his pain spring up to a 10/10. He tends to be all or nothing in his approach as he was able to walk to the exam room and back without lapsing into horrible pain.... The Percocet he is currently taking helps somewhat but does not totally relieve his pain to the point he could go back to work. I am puzzled by the fact that, per his report, he was much higher functioning prior to a year ago. He was holding down a full-time job and taking care of his activities of daily living. At this point, he indicates he cannot work and cannot do things such as do his own dishes. This is a big change but without documentation of past level of functioning, it is difficult to say whether this is accurate or not.

(Administrative Record at 446.) Dr. Stockman diagnosed Brace with bipolar disorder and chronic back and foot pain. Dr. Stockman recommended long-term supportive therapy focusing on problem solving as treatment.

On July 6, 2004, at the request of Brace's attorney, Ronald C. Larson, LISW ("Larson"), a licensed independent social worker, completed a mental impairment questionnaire for Brace. Larson diagnosed Brace with bipolar depression. Larson noted that Brace's diagnosis was serious and made more difficult by his non-compliance with his treatment plan. Larson indicated that Brace's symptoms were "mood disturbance" and "persistent disturbances of mood or affect." Larson determined that Brace had the following limitations: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace.

On July 13, 2004, Brace visited the UIHC complaining of pain in both feet, pain in both legs, and diffuse body pain. Brace met with Amr Edrees ("Edrees"), a Fellow at the UIHC. Upon examination, Edrees found no evidence of synovitis with normal range of movement in his joints. X-rays of Brace's feet and ankles were negative. The X-rays showed no evidence of any joint or bone abnormalities and no evidence of arthritis in both ankles and feet. Edrees, however, found tenderness over both ankles and mid-foot joints. Edrees also noted that Brace had positive tender points for fibromyalgia bilaterally of his occiput, neck, trapezius, supraspina-

---

5. *See* Administrative Record at 365.

tus, rib, epicondyle, gluteal, and right knee. Edrees diagnosed Brace with fibromyalgia. Specifically, Edrees opined that Brace "has multiple medical problems, and on today's exam, he has clinical evidence of fibromyalgia. He has a history of widespread body pain and sleep disturbance with positive tender points for fibromyalgia." [6] Edrees recommended regular exercise and physical therapy as treatment.

On August 30, 2004, Brace met with Dr. Ann Broderick, M.D., for follow-up on an earlier diagnosis of diabetes. Dr. Broderick noted that Brace had a history of hypertension, hypothyroidism, fatty liver with esophageal varices, and bipolar disorder. Brace informed Dr. Broderick that he continued to experience numbness and pain in both lower extremities, especially his feet. Upon examination, Dr. Broderick found decreased sensation in both of his feet, below the ankles. Dr. Broderick diagnosed Brace with diabetes, hyperlipidemia, hypothyroidism, fibromyalgia, psychiatric issues, and gastroenterological problems. Dr. Broderick recommended exercise, physical therapy, and medications for treatment.

On November 5, 2004, Dr. Theodore S. Lederman, M.D., Brace's primary physician, provided Brace's attorney with a letter outlining Brace's medical problems, including diabetes 2, GERD, hypothyroid, history of depression, hypertension, elevated liver function test, coagulation disorder, fatty liver, esophageal varices, bipolar affective disorder and fibromyalgia. Dr. Lederman noted that Brace thought he was unable to work due to diabetic neuropathy. According to Dr. Lederman, Brace needed a neurologic consult to prove that he had diabetic neuropathy. Dr. Lederman opined, however, that in general,

Brace was "not employable at the present time due to his other conditions." [7] Dr. Lederman also provided a letter dated August 28, 2006, where concluded that because of Brace's "multiple medical problems and his psychiatric illness" . . . he is medically disabled.[8]

On November 12, 2004, Dr. M.F. Piburn, Jr., M.D., completed a mental impairment questionnaire for Brace. Dr. Piburn indicated that he met with Brace every two months for thirty minutes sessions beginning in June, 2004. Dr. Piburn diagnosed Brace with bipolar disorder, anxiety disorder, and chronic poor health. Dr. Piburn provided that Brace suffered from the following symptoms: anhedonia or pervasive loss of interest in almost all activities, decreased energy, thoughts of suicide, feelings of guilt and worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, apprehensive expectation, bipolar syndrome, history of hallucinations or delusions, flight of ideas, manic syndrome, mood swings, easy distractibility, short-term memory impairment, and sleep disturbance. Dr. Piburn opined that Brace's psychiatric condition exacerbates his experience of pain. Dr. Piburn determined that Brace had the following limitations: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Piburn also determined that Brace had or would have four or more episodes of decompensation, lasting at least two weeks, within a 12 month period. Lastly, Dr. Piburn opined that Brace's impairments would cause him to be absent more than four days per month from work.

---

**6.** *See* Administrative Record at 443.

**7.** *Id.* at 369.

**8.** *See* Administrative Record at 644.

On December 13, 2004, Brace visited Dr. Hamid for follow-up on his leg and foot pain. Upon examination, Dr. Hamid found Brace's upper extremity strength to be 5/5 bilaterally and his lower extremity strength to be 5/5 bilaterally. Dr. Hamid also found that Brace had decreased sensation in both feet below the ankles and no sensitivity with light touch. Dr. Hamid diagnosed Brace with diabetic neuropathy. Dr. Hamid recommended starting new medication and adjusting old medications as treatment.

On December 22, 2004, at Brace's attorney's request, Dr. Broderick provided a "Medical Opinion of Ability to Do Work–Related Activities" assessment. Dr. Broderick determined that Brace could: (1) Occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of less than two hours in an eight-hour workday, and (4) sit with normal breaks for a total of about two hours in an eight-hour workday. Dr. Broderick also determined that Brace: (1) Could sit for 30 minutes before changing positions, (2) could stand for 10 minutes before changing positions, (3) would need to walk around every 15 minutes, and (4) must walk for 5 minutes at a time. Dr. Broderick further determined that Brace could twist, stoop, and crouch occasionally, and should not climb stairs or ladders. Dr. Broderick opined that Brace's diabetic neuropathy and fibromyalgia support her limitation determinations. Dr. Broderick also noted that Brace's ability to deal with any pain was minimal due to his bipolar disorder. Lastly, Dr. Broderick estimated that Brace would miss more than four days of work per month because of his impairments. In a letter accompanying the Medical Opinion assessment, Dr. Broderick summarized her findings:

[Brace] has two major medical conditions that have been contributing to his pain syndromes: diabetic neuropathy and fibromyalgia. He has multiple co-morbidities that make it difficult for him to work. The most important of these illnesses is bipolar disease. His mental impairment makes him completely unable to cope with his physical impairment. This point bears emphasis because ... on the face of it, he is not physically impaired to a degree that would make him unemployable but his refractory bipolar illness and depression make him unemployable. I have rarely seen psychiatric illness impair someone physically to this degree. I strongly support disability in this patient (and I do not usually write such a strong recommendation).

(Administrative Record at 419.)

On February 16, 2005, Brace was admitted to UIHC for suicidal ideation. At the time of his admission, Brace reported he:

felt down or depressed for two days. He has chronic insomnia, low self-esteem, and suicidal ideation. He feels guilty about 'everything, such as his life in general, poor choices made in the past,' but believes he is a 'good person.' [He e]ndorses having anxiety towards his financial situation and physical illness.

(Administrative Record at 563.) While admitted at the UIHC, Brace was cooperative with treatment and his medications were adjusted to help his psychiatric health. Brace was discharged from the hospital as improved and physically stable, on February 21, 2005.

At the request of Brace's attorney, Brace was evaluated by Ralph Scott ("Scott"), a licensed psychologist, for clarification of his emotional and behavioral statuses, on March 30 and 31, 2005 and April 5, 2005. Scott described Brace's activities of daily living as follows:

Now living alone, [Brace] has little routine and gets up at various hours depending on how he has slept: some nights he doesn't sleep at all. His appetite varies and he prepares simple meals, often with his mother's help. Partly because of difficulty walking (he reportedly cannot stand on his feet for more than 90 minutes at a time and has difficulty walking several blocks) [Brace] depends on his mother for much of the housekeeping, laundry, and shopping[.] ... [Brace] belongs to no community organizations, and except for support from his mother and occasional visits with his two daughters who live in the area, he has no significant social ties. (Administrative Record at 505.) After administering several tests, Scott concluded that Brace's cognitive abilities were in the mid-range of the low average category. Scott diagnosed Brace with bipolar disorder, learning disorder, and psychiatric disorder. Scott opined that "[Brace] could not presently succeed in competitive employment unless provided extensive accommodations, including a consistent treatment regimen employing monitoring of medications and counseling, supportive supervision at the work site which requires limited interpersonal contacts, and assignment to routine and essentially nonverbal low-skill tasks." [9]

On September 29, 2005, Brace met with Dr. Joseph J. Chen, M.D., complaining of chronic back pain and neuropathy. Brace informed Dr. Chen that the pain is typically worse when he sits for a long period of time or when he stands for a long period of time. Upon examination, Dr. Chen found Brace's gait to be normal and his lower extremity reflexes and strength to be normal. Dr. Chen also found sitting straight leg raise to be negative for pain and hip and knee range of motion to be generally normal. Dr. Chen also reviewed X-rays of Brace's lumbar spine and found "some very mild age appropriate lumbar spondylosis but nothing that ... would be the etiology of his diffuse myofascial pain." [10] Dr. Chen diagnosed Brace with chronic low back pain. Dr. Chen recommended exercise and physical therapy as treatment.

On February 9, 2006, Brace underwent a disability examination performed by Dr. Daniel R. Farrell, M.D. Brace informed Dr. Farrell that his primary disability involved problems with his toes and extreme pain on the bottom of his feet. Brace further informed Dr. Farrell that his pain moved from his feet to his knees and he experienced burning and swelling in both legs. Brace claimed that there were times when he was unable to walk. Dr. Farrell noted that Brace "is able to shower and dress himself. He is able to generally care for himself and cook for himself. He is able to clean[.] ... [H]e is able to shop and do laundry for himself. He does drive and is able to do yard work but he avoids it." [11] After examining him, Dr. Farrell concluded that Brace appeared "employable from a physical standpoint but mentally he would need to be evaluated ... to ... [assess] ... his compatibility in a workplace." [12]

9. *See* Administrative Record at 507.

10. *See* Administrative Record at 610.

11. *Id.* at 613.

12. *Id.* at 614. Dr. Ferrall also noted that "[j]ust from today's exam, he may be able to cope in a workplace environment but I could

see where at times he probably starts having some of his bothersome ailments and might not be easy to get along with and may cause a problem. This would be more of a psychological disability relating to work. Physically he does not exhibit any of the leg swelling that he relates as his primary concern. Even sensory evaluation was benign as well as motor

On February 9, 2006, a doctor,[13] provided the Social Security Administrative Office of Hearings and Appeals with a "Medical Source Statement of Ability To Do Work–Related Activities (Physical)" for Brace. The doctor reviewed Brace's medical records and found no lifting/carrying limitations and determined that Brace could occasionally lift 50 pounds. The doctor also determined that Brace could stand and/or walk for at least two hours in an eight-hour workday and must periodically alternate between sitting and standing to relieve pain or discomfort. The doctor found that Brace was not limited in his ability to push or pull things. The doctor determined that Brace could occasionally climb, balance, kneel, crouch, crawl, and stoop. Lastly, the doctor found no manipulative, visual, communicative, or environmental limitations for Brace.

On October 6, 2006, Dr. Broderick provided a second "Medical Opinion of Ability to Do Work–Related Activities" assessment. Dr. Broderick determined that Brace could: (1) Occasionally lift and/or carry 10 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of less than two hours in an eight-hour workday, and (4) sit with normal breaks for a total of about four hours in an eight-hour workday. Dr. Broderick also determined that Brace: (1) Could sit for 20 minutes before changing positions, (2) could stand for 20 minutes before changing positions, (3) would need to walk around every 20 minutes, and (4) must walk for 5 minutes at a time. Dr. Broderick further determined that Brace should never twist, stoop, crouch, or climb ladders, but could occasionally climb stairs.

Lastly, Dr. Broderick estimated that Brace would miss more than four days of work per month because of his impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Brace is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir.2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir.2003). The five steps an ALJ must consider are:

(1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir.2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590–91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir.2002)).

██ "To establish a disability claim, the claimant bears the initial burden of proof

---

and reflex evaluation of the extremities, particularly the lower extremities." *Id.*

**13.** The signature of the doctor who provided the Social Security Administrative Office of Hearings and Appeals with a "Medical

Source Statement of Ability To Do Work–Related Activities (Physical)" for Brace is illegible and therefore unknown to the Court. *See* Administrative Record at 619.

to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. " 'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.' " *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir.2005) (quoting *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir.2001)).

The ALJ applied the first step of the analysis and determined that Brace had not engaged in substantial gainful activity since his alleged disability onset date, September 30, 2001.[14] At the second step, the ALJ concluded that Brace had the following impairments "mild obesity, mild degenerative disc disease of the lumbosacral spine, questionable diabetic peripheral neuropathy, a remote history of substance abuse, Type II diabetes mellitus, hypothyroidism, hypertension, gastroesophageal reflux disease, liver disease, headaches, and bipolar disorder controlled or controllable by medication." At the third step, the ALJ found that Brace did not have an "impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in [20 C.F.R. § 404,] Appendix 1, Subpart P, Regulations No. 4 [ (the Listing of Impairments) ]." At the fourth step, the ALJ determined Brace's RFC as follows:

> [Brace] has the residual functional capacity to perform physical exertional and nonexertional requirements of work except for lifting or carrying more than 25 pounds frequently or more than 50 pounds occasionally; more than occasional climbing, stooping, bending, or squatting, work in extreme heat or at unprotected heights or around dangerous moving machinery; work requiring close detail, independent judgment for decision making, or more than simple, repetitive tasks; or work requiring more than occasional contact with co-workers, supervisors or the general public or more than a mild to moderate stress level.

The ALJ determined that Brace was unable to perform any past relevant work. At the fifth step, the ALJ determined that there are "a significant number of jobs in the local and national economies which [Brace] could perform." Therefore, the ALJ concluded Brace was "not disabled."

## B. Whether the ALJ Fully and Fairly Developed the Record

Brace contends that the ALJ erred in three respects. First, Brace argues that the ALJ failed to give adequate weight to the opinions of his treating physicians. Next, Brace argues that the ALJ's RFC finding is not based on substantial evidence. Lastly, Brace argues that the ALJ failed to properly evaluate his subjective complaints.

### 1. The Opinions of Brace's Treating Physicians

Brace argues that the ALJ failed to give proper weight to the medical opinions of

---

**14.** The ALJ noted that Brace worked part-time for three months in 2003, but that work did not constitute substantial gainful activity under the Social Security guidelines.

Dr. Lederman, Dr. Broderick, and Dr. Piburn. Specifically, Brace maintains that the opinions of Drs. Lederman, Broderick, and Piburn should have be given controlling weight. Brace further argues that the ALJ erred because he did not properly explain his reasons for not giving the opinions of these doctors controlling weight.

 An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir.2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(i). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh,* 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating

physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001) (citing *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir.2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.; see also Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003) (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); *Strongson,* 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen,* 881 F.2d 561, 564 (8th Cir.1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In discussing the medical opinions of Drs. Broderick and Piburn, the ALJ stated:

> If one takes at face value the opinions of Dr. Broderick ... or Dr. Piburn ... [Brace] is of course unemployable. There are reasons for discounting these opinions[.] ... Dr. Broderick may be a treating physician whose opinion is normally entitled to great weight ... [however,] Dr. Farrell, was skeptical that [Brace] even had the peripheral neuropathy upon which Dr. Broderick primarily based her conclusion of disability....
>
> As to Dr. Piburn, some of his assessment was based on supposed physical impairments beyond his range or his history of treatment for [Brace].

(Administrative Record at 25–26.) The ALJ also noted that "[f]or every medical opinion that [Brace] is unemployable, there is at least one opinion that his medical

impairments are not nearly so bad or, if they are, that they are controllable with better medication compliance, for which [Brace] has no good excuse." [15]

A review of Dr. Broderick's treatment notes show that generally she indicated that Brace's leg pain was treated by medication and the UIHC Chronic Pain Clinic.[16] Significantly, on November 22, 2004, Dr. Broderick noted that Brace's pain improved after an adjustment of his medications.[17] Dr. Broderick's treatment notes also show that generally she indicated that Brace's bipolar disorder and psychiatric issues were managed by medication and his psychiatrist.[18] Significantly, on November 22, 2004, one month before opining that Brace was unemployable because of his bipolar disorder, Dr. Broderick noted that Brace's "bipolar disorder is stable now and no active issues." [19] Dr. Broderick's treatment notes do not support the conclusions she draws regarding Brace's employability in the "Medical Opinion of Ability to Do Work–Related Activities" assessments she provided to Brace's attorney and are inconsistent with the record as a whole.

Similarly, Dr. Piburn's treatment notes at no place state that Brace's psychiatric issues are disabling or that he is unemployable. Dr. Piburn's treatment notes generally and consistently state that: (1) Brace is treated with medication; (2) the goal of the medication is symptom control;

(3) Brace's response to the medication is moderate; (4) the goal of remission has not been achieved; and (5) Brace's symptoms have improved or improvement is realistic.[20] Dr. Piburn's treatment notes also do not support the conclusions he draws regarding Brace's employability in the mental impairment questionnaire he provided to Brace's attorney and are inconsistent with the record as a whole.

■ Although not a model of clarity, the ALJ's decision both specifically and generally points out inconsistencies with the opinions of Drs. Broderick and Piburn and the record as a whole. *See Vester,* 416 F.3d at 889. After reviewing the entire record, the Court also finds that the opinions of Drs. Broderick and Piburn in the "Medical Opinion of Ability to Do Work–Related Activities" assessments and mental impairment questionnaire are inconsistent with their own treatment notes and the record as whole. *Id.* The Court further finds that there is substantial evidence in the record as a whole which supports the ALJ's determination to give little weight to the opinions of Drs. Broderick and Piburn because their conclusions that Brace is not capable of employment are not supported by objective medical evidence or medically acceptable clinical and laboratory diagnostic techniques. *See Travis,* 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability."); *see also*

---

**15.** *See* Administrative Record at 27.

**16.** *See* Administrative Record at 428, 441, 547, 555, 570. A treatment note, dated March 23, 2005, does not even mention Brace's leg problems or chronic pain. *Id.* at 558. There is also only one treatment note which states that Brace's pain is disabling. This treatment note, however, does not explain or offer any reasons for Brace's pain being disabling. *Id.* at 547.

**17.** *Id.* at 428.

**18.** *Id.* at 428, 441, 547, 555, 558, 570. There is only one treatment note which describes Brace's bipolar disorder as disabling. Again, this treatment does not, however, explain or offer any reasons for her assertion that Brace's bipolar disorder is disabling. *See* Administrative Record at 555.

**19.** *Id.* at 428.

**20.** *See* Administrative Record at 511–13, 516.

*Singh,* 222 F.3d at 452 (a treating physician's opinion is afforded significant weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."). Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams,* 393 F.3d at 801.

■ Additionally, the letters provided by Dr. Lederman which state Brace is "not employable" and "medically disabled" are simply conclusory in nature and unsupported by the medical evidence.[21] *See Cox v. Barnhart,* 345 F.3d 606, 608 (8th Cir. 2003) ("The ALJ is correct in stating that conclusory statements by a doctor, if unsupported by the medical record, do not bind the ALJ in his disability determination."); *Ward v. Heckler,* 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted ... where the treating physician's statements were conclusory in nature."). At no place in his treatment notes does Dr. Lederman opine that Brace is disabled. The treatment notes simply recite Brace's diagnoses and the medication prescribed for treatment. Thus, the Court finds that the opinions expressed by Dr. Lederman in his letters provided to Brace's attorney are not supported by substantial evidence on the record as a whole. *See Vester,* 416 F.3d at 889.

### 2. Brace's RFC

Brace argues that the ALJ's RFC determination is not based on substantial evidence. Specifically, Brace argues that:

> In making [the RFC] finding, the ALJ did not indicate the medical evidence upon which he relied in determining

[Brace's] RFC. In his [d]ecision, the ALJ stated that he found no persuasive medical reason why [Brace] could not perform medium work[.] ... As to [Brace's] overall mental functioning, he found [Brace] has no worse than a moderate limitation in his ability to do basic work activities, without indicating the medical evidence upon which he relied in making that finding.

(Brace's Brief at 15.) Brace maintains that the ALJ should have relied on the RFC findings of Dr. Broderick in her "Medical Opinion of Ability to Do Work–Related Activities" assessments and the mental RFC findings of Dr. Piburn provided in his mental impairment questionnaire assessment.

■ An ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams,* 393 F.3d at 803; *see also Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir.2000) (same). Relevant evidence for determining a claimant's RFC includes " 'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.' " *Lacroix v. Barnhart,* 465 F.3d 881, 887 (8th Cir.2006) (quoting *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir.2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams,* 393 F.3d at 803 (citing *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004)). In considering medical evidence, an ALJ may " 'reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.' " *Wagner v. Astrue,* 499 F.3d 842, 848 (8th Cir.2007) (quoting *Pearsall,* 274 F.3d at 1219).

In his decision, the ALJ stated:

21. *Id.* at 369, 644.

The undersigned is not ignoring [Brace's] complaints, or the opinions of the doctors and psychiatrists who ostensibly support his claim for disability, but he is not accepting them as controlling. The limitations the vocational expert was asked to assume in determining [Brace's] employability were reasonable ones based on the preponderance of the physical and mental medical evidence.

(Administrative Record at 27.) The ALJ's decision also contains a thorough discussion of the medical evidence, opinions of treating and non-treating doctors, and Brace's own testimony.

 In section *V.B.1* of this decision, the Court found Drs. Broderick's and Piburn's assessments which Brace relies on here to be both internally inconsistent with their own treatment notes and inconsistent with the record as a whole. *See Vester,* 416 F.3d at 889. Additionally, the Court finds that, in his decision, the ALJ properly set forth and considered the medical evidence contained in the record, the opinions of treating and non-treating doctors, and Brace's own testimony. Therefore, having reviewed the entire record, the Court finds that the ALJ considered all of the relevant evidence and based his RFC assessment on that evidence. *See Guilliams,* 393 F.3d at 803; *Roberts,* 222 F.3d at 469. Accordingly, the ALJ's decision in this respect should be affirmed.

### 3. Credibility Determination

Brace argues that the ALJ failed to properly evaluate his subjective complaints of pain and disability. Specifically, Brace argues that the ALJ failed to analyze the *Polaski* factors when making his credibility determination. Brace concludes that "[s]ince ... Brace's subjective complaints were rejected without discussing the *Polaski* factors, and the matters that were discussed do not provide a basis for dis-

crediting ... Brace's complaints, the ALJ failed to properly evaluate [Brace's] subjective complaints." [22]

 When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski,* 739 F.2d at 1322. However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski,* 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart,* 433 F.3d 575, 578 (8th Cir.2006) (citing *Polaski,* 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson,* 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir.2001) (citing *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996)); *see also Guilliams,* 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). " 'The credibility of a claimant's subjective testimony is pri-

---

**22.** *See* Brace's Brief at 19.

marily for the ALJ to decide, not the courts.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall*, 274 F.3d at 1218).

In his decision, the ALJ properly set forth the law for making a credibility determination under *Polaski* and the Social Security Regulations. In applying the law, the ALJ determined that "the preponderance of the medical and other evidence to be inconsistent with [Brace's] allegation of disability."[23] Specifically, in making his credibility determination, the ALJ considered and discussed Brace's prior work record,[24] the objective medical record,[25] Brace's noncompliance with his medications,[26] the effectiveness and side effects of his medication,[27] and inconsistencies with his allegations of disabling pain and the medical record.[28] Having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Brace's allegations of disabling pain were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996).").

## VI. CONCLUSION

The Court finds that the ALJ fully considered the medical evidence in the record, properly determined Brace's RFC, and made a proper credibility finding with regard to Brace's allegations of disabling pain. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

---

23. *See* Administrative Record at 21.

24. *Id.*

25. *Id.* at 21–27.

26. *Id.* at 26.

27. *Id.*

28. *Id.; see also* Administrative Record at 21–27.