# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2813

_____

Talat E. Sultan,                              *
                                              *
     Plaintiff - Appellant,          *
                                              *  Appeal from the United States
     v.                              *  District Court for the
                                              *  Southern District of Iowa.
Jo Anne B. Barnhart,                          *
Commissioner of Social Security,              *
                                              *
     Defendant - Appellee.           *

_____

Submitted: April 16, 2004

Filed: May 13, 2004

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Talat Sultan applied for supplemental income disability benefits alleging that he could not work because of back trouble, heart palpitations, rectal bleeding, and mental illness. An administrative law judge (ALJ) determined that Sultan could perform a range of light work available in significant numbers in the national economy and denied his application. The Appeals Council denied his request for

review, and Sultan brought this action seeking judicial review. The district court[1] granted summary judgment in favor of the Commissioner of Social Security. Sultan appeals, arguing that he is disabled and that the ALJ underestimated the severity of his mental illness. We affirm.

Sultan's mental illness dates to at least 1993 when he was hospitalized after threatening his mother with a knife. In the previous year he had missed many days of school and had occasionally experienced auditory hallucinations. Treating psychologist Stanley Patterson, Ph.D., noted that Sultan's mother had a long history of chronic schizophrenia and tentatively diagnosed Sultan with "separation anxiety disorder." Dr. Patterson wanted further tests to "rule out schizophrenia." Although Sultan's prognosis was "somewhat guarded," Dr. Patterson believed it could improve if Sultan continued to take medication and participate in therapy.

Since then Sultan has been treated by numerous providers of psychological and psychiatric care. In the mid 1990s he was seen regularly by Dr. Joshua Nnanji, M.D., for schizophrenic diathesis and attention deficit disorder. Dr. Nnanji's treatment notes from that time report that Sultan was doing "well" on a combination of Ritalin (for attention deficit disorder), Olanzapine (an antipsychotic), and Serzone (an antidepressant). In 1998 Sultan began seeing Dr. Grey Woodman, M.D., whose notes report that Sultan was of normal intelligence and "[did] not appear to be hallucinating or delusional or indeed with any thought disorder and he does seem to be oriented to time, place and person." When Sultan subsequently began experiencing hallucinations and difficulty controlling his anger, Dr. Woodman increased his Olanzapine dosage and reported that this helped "a good deal."

---

[1]The Honorable Charles R. Wolle, United States District Judge for the District of Southern Iowa.

Dr. Richard Hauser, M.D., evaluated Sultan in October 1999. At that time Sultan was taking only Zyprexa (another antipsychotic), which he said was controlling his symptoms without any side effects. Dr. Hauser found his mood and affect appropriate but "angry," his gait and speech "slow," his insight into his condition "partial," and his activity level "low." Sultan was found to be well groomed with normal orientation, appetite, sleep, thought process, and thought content. Dr. Hauser noted that Sultan had difficulty concentrating and impaired judgment, however. Diagnoses included adolescent onset conduct disorder and adolescent antisocial behavior. A Global Assessment of Functioning (GAF) of 70 was made which indicates some mild symptoms (such as depressed mood or insomnia) or some difficulty in social, occupational, and school functioning but generally good functioning and some meaningful interpersonal relationships. Dr. Hauser increased Sultan's Zyprexa dosage two months later in response to outbursts of anger.

Sultan's teacher, David Fry, completed an evaluation of his educational performance in November 1999. Sultan had been placed in a small group special education class. Fry noted that Sultan had a positive attitude with peers and staff, good manners, and a pleasant tone of voice, although he had difficulty taking criticism and often had body odor and dirty hair. Fry observed that Sultan enjoyed structured activities, but tended to stare off into space during unstructured free time. Sultan continued to have attendance problems but otherwise participated in all classroom and physical education activities. Fry reported that Sultan was withdrawn from his peers outside the classroom and worked as a paper shredder for ten hours a week outside of school. In February 2000 Fry reported that Sultan's attendance problems would delay his graduation, but that Sultan was ahead of his peers in concentration and task performance and always completed his work if he came to school. Reports from other educators suggested that Sultan required close attention from a teacher to succeed, that he had difficulty maintaining attendance, and that his academic skills were many years behind his grade level.

Sultan first applied for disability benefits in December 1999. In March 2000, he was referred to a disability consultant for the State of Iowa, Dr. Stanley Rabinowitz, M.D, for evaluation of his back problems. Dr. Rabinowitz found Sultan to be physically normal overall with mild scoliosis and back pain, but expressed no opinion about his psychological and heart disorders. After reviewing the evidence, a nonexamining state medical consultant, Dr. Dennis Weis, M.D., concurred with Dr. Rabinowitz's determination that Sultan's back problems did not rise to the level of disability. Another nonexaming consultant, Dr. Rene Staudacer, M.D., reached the same assessment in April 2001.

In May 2000 nonexamining psychologist Dr. John Tedesco determined that Sultan's psychological conditions would moderately restrict his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and perform activities within a regular schedule. In October 2000 another nonexamining consultant, Dee Wright, Ph.D., reviewed Sultan's records and concluded that his mental impairments did not create significant restrictions of function cognitively, socially, or with activities of daily living.

Sultan began seeing Dr. Alberto Sanchez, M.D., in March 2000. Dr. Sanchez found Sultan to be mildly tense and anxious, but found his affect mobile and appropriate and his appearance neat and well groomed. He saw no evidence of psychotic or suicidal thoughts or of side effects from medication, and Sultan was found to have fair judgment and impulse control. Dr. Sanchez increased Sultan's Zyprexa dosage to help with his aggressiveness. Sultan saw him again in June and reported that he was doing "very well" on his current medications and was eating and sleeping well.

Dr. Sanchez saw Sultan again in September 2000 on an emergency basis because he had been hearing voices after a few stressful weeks at home. His medications were increased, and he was referred to a staff nurse for help in finding

-4-

a place to live independently. In October Dr. Sanchez saw Sultan again and found that his symptoms had improved in spite of continued stress with his family at home. In July 2001 Dr. Sanchez noted that he had started Sultan on Geodon (another antipsychotic) after Sultan reported visual hallucinations at an earlier meeting. The new medication eliminated these hallucinations, and Dr. Sanchez reported Sultan's mood as euthymic.[2] Dr. Sanchez reported that the combination of Geodon with a lower dose of Zyprexa was working well to control Sultan's symptoms without side effects.

In September 2001 Dr. Sanchez filled out a form related to Sultan's claim for benefits which dealt specifically with his ability to do work related activities. He stated that Sultan was "severely limited in his functional capacities by severe schizophrenia paranoid type." He checked boxes to indicate that Sultan had little or no useful ability to remember work procedures, to maintain attention for two hour segments, to attend regularly, to be punctual, to sustain an ordinary routine without supervision, to work in coordination with others without distraction, to complete a normal work day or week without interruption from psychological symptoms, to function at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism, to get along with coworkers without unduly distracting them or exhibiting extreme behavior, to deal with normal work stress, to set realistic goals or independently make plans, or to interact appropriately with the general public. Jackie Kramer, a registered nurse at the center where Sultan had been treated, made similar observations in a letter to his attorney. She stated that Sultan was "unable to support himself with competitive employment" because of his various psychiatric problems and that he was "in need of support to maintain his status of living within the community."

---

[2]Euthymic is a medical term referring to a joyful or tranquil mood, neither manic nor depressed.

An administrative hearing was held on September 13, 2001. Sultan testified that he was then 20 years old and lived with his parents. He testified that his medication helped his symptoms without serious side effects. He also testified that he had worked approximately thirty hours per week as a general laborer through a job training program during the summer of 1998, missing only one day of work due to flu. He had also worked about ten hours per week as a paper shredder while he was in school and had recently turned down a job at a local restaurant because it required too much lifting. He testified that he got along well with friends and past coworkers, regularly performed household chores, walked around his neighborhood, watched television, read, listened to music, visited friends, and used the city bus for transportation.

The ALJ applied the Social Security Administration standard five step sequential procedure in evaluating Sultan's disability claim. See 20 C.F.R. § 416.920(a) (2004). First, he found that Sultan had never engaged in substantial gainful activity. See § 416.920(a)(4)(i). Second, he determined that Sultan was not at all impaired by his minor heart and rectal problems, but that he was severely impaired by his scoliosis and mental illness. See § 416.920(a)(4)(ii). Third, the ALJ found that none of Sultan's impairments was so severe as to qualify him automatically for disability status. See § 416.920(a)(4)(iii). Fourth, he proceeded to assess Sultan's residual functional capacity. See § 416.920(a)(4)(iv). Finally, he considered whether Sultan could make the adjustment to work in the competitive economy given his age, education, work experience, and residual functional capacity. See § 416.920(a)(4)(v).

In assessing Sultan's residual functional capacity, the ALJ found Sultan to be generally credible, but not in respect to his claim that his impairments were so severe as to preclude his engagement in substantial gainful activity. He found that the totality of the evidence failed to support the written statements of Dr. Sanchez and nurse Kramer about the level of Sultan's disability, because they were contradicted

by other evidence in the record. Virtually all of the other medical evidence in the record, including Dr. Sanchez's own treatment notes, showed that Sultan's medications were effective in treating his mental illness with minimal side effects. Further, his scoliosis only moderately impaired his ability to perform physical labor. The ALJ determined that Sultan had the residual functional capacity to lift and carry no more than 10 pounds frequently and 20 pounds occasionally. He could sit or stand for two hours continuously, for a total of six hours of an eight hour workday, and walk up to four blocks at a time. He could not climb ladders, ropes or scaffolds. Sultan required a job with a stress level of 4 on a scale from 1 to 10, limited contact with coworkers, and no dealing with the general public. He had to avoid concentrated exposure to fumes, odors, gases, and poor ventilation. He was also restricted from working at heights or around dangerous equipment.

The ALJ then determined that Sultan could make the adjustment to work in the competitive economy. See 20 C.F.R. § 416.920(a)(4)(v). Because Sultan had no relevant past work experience, the burden shifted to the Commissioner to show that jobs exist in significant numbers in the state and national economy which Sultan could perform. See Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003). At the administrative hearing the ALJ asked a vocational expert whether someone with Sultan's characteristics and residual functional capacity could perform work available in the national economy. The expert testified that someone like Sultan could perform the jobs of assembler of small products (22,000 jobs nationally), bottling line attendant (250,000 jobs nationally), addresser (40,000 jobs nationally), surveillance system monitor (68,000 jobs nationally), or document preparer (21,000 jobs nationally).

Since the ALJ determined that Sultan could perform a range of light work available in significant numbers in the national economy, he was found not disabled within the meaning of the Social Security Act. See 42 U.S.C. § 416(i) (2004) (disability means "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment"). The ALJ denied Sultan's application on April 25, 2002. The Appeals Council denied Sultan's request for review on July 17, 2002. The district court found that there was substantial evidence in the record to support the ALJ's denial of Sultan's claim, and summary judgment was granted in favor of the Commissioner on May 16, 2003. This appeal followed.

We review de novo the district court's grant of summary judgment upholding the ALJ's denial of social security benefits. Lewis v. Barnhart, 353 F.3d 642, 644 (8th Cir. 2003). In conducting our review, we must determine whether the Commissioner's decision is supported by substantial evidence in the record as a whole. Id. Substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.2000). To determine whether the evidence is substantial, "we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." Id. We are not permitted to reverse because substantial evidence also exists that would support a contrary outcome or because we would have decided the case differently. Id.

Sultan argues that in determining his residual functional capacity the ALJ should have given controlling weight to the opinions of two treating clinicians, Dr. Sanchez and nurse Kramer. Dr. Sanchez had opined that Sultan was "severely limited in his functional capacities by severe schizophrenia paranoid type." Nurse Kramer stated in a letter to Sultan's attorney that she believed he was unable to support himself with competitive employment because of his mental illness. A treatment provider's opinion is to be given controlling weight if it is supported by acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003).

The ALJ found that the opinions of Dr. Sanchez and nurse Kramer overstated the extent of Sultan's disability. Sultan's own testimony established that his medications alleviated his symptoms without significant side effects, that he had a normal range of daily activity, and that he could get along well with others. Treatment notes from Sultan's physicians — including Dr. Sanchez himself — established that Sultan's medications effectively controlled the symptoms of his mental illness with minimal side effects. No treating physician consistently observed that Sultan had limitations as severe as those described by Dr. Sanchez and nurse Kramer. The ALJ sufficiently identified the inconsistencies between the opinions of Dr. Sanchez and nurse Kramer and the other evidence in the case which permitted his not giving controlling weight to their opinions . See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Sultan next argues that even if it was proper to reject the opinions of these two treatment providers as to his limitations, the ALJ should have recontacted Dr. Sanchez for clarification or ordered a new consultative evaluation to assess Sultan's mental and physical residual functional capacity. The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. See 20 C.F.R. §§ 416.912(e), 416.919a(b). The administrative record in this case contains many medical and school records which provided ample basis upon which the ALJ could make an informed determination of the merits of Sultan's disability claim. The ALJ did not err by refusing to recontact Sultan's treating physicians or to order new consultative evaluations. See Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

Sultan also argues that the ALJ did not properly consider the opinions of the nonexamining state agency consultants. Such evidence is entitled to little weight in evaluating a claimant's disability. See 20 C.F.R. § 416.927(d)(1). Even so, the ALJ considered the nonexamining consultant opinions, but rejected that of Dr. John

Tedesco because it contradicted much of the evidence provided by Sultan's treating physicians and the opinions of the other nonexamining experts. We do not see that the ALJ erred in his treatment of this evidence.

Sultan finally argues that the ALJ's assessment of his mental residual functional capacity is not supported by substantial evidence in the record. The evidence relevant to a residual functional capacity determination includes the medical records, observations of the treating physicians and others, and an individual's own description of his limitations. McKinney, 228 F.3d at 863. As discussed above, the ALJ did not err in rejecting Dr. Sanchez's statements that Sultan had no real ability to function in numerous areas relevant to employment. Virtually all of his medical providers, including Dr. Sanchez, reported in treatment notes that he was doing well on his medication as adjusted from time to time and that he was functioning at a reasonable level at school and at home. Dr. Hauser reported a Global Assessment of Functioning of 70, indicating relatively mild symptoms. Sultan's teacher reported that his concentration was superior to that of his impaired classmates, that he completed his work independently and on time when he attended school, and that he stayed on task at school. Finally, the evidence suggests that Sultan had a fairly normal daily life, including household chores, time with friends, and independent mobility. Finding that the evidence contradicted Sultan's claims of more extensive disability, the ALJ determined that his limitations included the inability to lift more than 20 pounds, the need to work in a low stress environment, and the need to have limited contact with coworkers and none with the public. After reviewing the administrative record, we conclude that substantial evidence supports the ALJ's assessment of Sultan's residual functional capacity.

The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to meet her burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform. See 20 C.F.R. § 416.966(e); Long v. Chater, 108 F.3d 185, 188 (8th Cir.

-10-

1997). The ALJ's hypothetical accurately recounted his findings as to Sultan's residual functional capacity, and a vocational expert's response to a properly phrased hypothetical question constitutes substantial evidence. <u>Haggard v. Apfel</u>, 175 F.3d 591, 595 (8th Cir. 1999). The expert identified a range of work available in substantial numbers in the national economy which Sultan would be able to perform given his limitations. There was therefore substantial evidence in the record to support the ALJ's determination that Sultan did not meet the Social Security Act's requirements for disability status because he did not have an "inability to engage in any substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2004).

Accordingly, the judgment of the district court is affirmed.

_____