**Sherry L. HARFORD, Plaintiff,**

**v.**

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. C08–0017.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Dec. 5, 2008.

Jeffrey P. Berg, Cedar Rapids, IA, Thomas A. Krause, West Des Moines, IA, for Plaintiff.

Lawrence D. Kudej, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

## RULING ON JUDICIAL REVIEW

JON STUART SCOLES, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ....................................................984

II. PRIOR PROCEEDINGS...............................................984

III. PRINCIPLES OF REVIEW ..........................................985

IV. FACTS ..........................................................985

A. Harford's Education and Employment Background ...................... 985
B. Administrative Hearing Testimony ................................ 986
 1. Harford's Testimony ........................................ 986
 2. Vocational Expert's Testimony .............................. 987
C. Harford's Medical History ...................................... 987

V. CONCLUSIONS OF LAW .......................................... 992
A. ALJ's Disability Determination ................................. 992
B. Objections Raised by Claimant ................................. 993
 1. Dr. Schroeder's Opinions .................................. 993
 2. Harford's Intellectual Functioning ........................ 995
 3. Development of the Record ................................. 996

VI. CONCLUSION ................................................. 997

VII. ORDER ..................................................... 997

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Sherry L. Harford on February 19, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Harford asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Harford requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On July 11, 2003, Harford applied for both disability insurance benefits and SSI benefits. In her applications, Harford alleged an inability to work since June 1, 2003 due to depression, post traumatic stress disorder ("PTSD"), and borderline intellectual functioning.[1] Harford's appli-

cation for SSI benefits was denied on October 21, 2003.[2] On January 15, 2004, her applications were denied on reconsideration. On March 31, 2004, Harford requested an administrative hearing before an Administrative Law Judge ("ALJ"). On November 1, 2005, Harford appeared with counsel, via video conference, before ALJ Jean M. Ingrassia for an administrative hearing. Harford and vocational expert Julie Svec testified at the hearing. In a decision dated February 8, 2006, the ALJ denied Harford's claim. The ALJ determined that Harford was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a cashier or production worker. Harford appealed the ALJ's decision. On December 27, 2007, the Appeals Council denied Harford's request for review. Consequently, the ALJ's February 8, 2006 decision was adopted as the Commissioner's final decision.

On February 19, 2008, Harford filed this action for judicial review. The Commis-

---

1. On December 10, 2003, Harford amended her disability onset date for her application for disability insurance benefits to December 15, 2001. On November 1, 2005, at the administrative hearing, Harford changed the disability onset date to June 6, 2003. See Administrative Record at 364.

2. The record does not contain an initial decision on Harford's application for disability insurance benefits. However, on October 29, 2003, Harford filed a request for reconsideration of the denial of her application for disability benefits. See Administrative Record at 49.

sioner filed an answer on May 12, 2008. On June 30, 2008, Harford filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she could perform her past relevant work. On August 25, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 10, 2008, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter ... a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive ..." *Id.*

■■■ The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart,* 416 F.3d 886, 889 (8th Cir.2005) (citing *Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir.2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to

support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart,* 368 F.3d 857, 862 (8th Cir.2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (quoting *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989), in turn quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

■■■ In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not reweigh the evidence." *Vester,* 416 F.3d at 889 (citing *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams,* 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir.1995)).

## IV. FACTS

### A. Harford's Education and Employment Background

Harford was born in 1969. She completed the eleventh grade.[3] She testified that while in school, she participated in special education classes because she had difficulties with "comprehension, understanding things."[4] The record contains a detailed earnings report for Harford. She had nominal earnings between 1986 and 1997,

---

**3.** The record also contains evidence that Harford earned her GED in 1998.

**4.** *See* Administrative Record at 376.

earning as little as $30.80 in 1989 and as much as $2,932.94 in 1997. She earned $9,927.61 in 1998, $13,266.88 in 1999, $9,875.72 in 2000, $11,488.78 in 2001, and $8,451.43 in 2002. However, in 2003, she only earned $661.95. In 2004, she earned approximately $4,600 at Wal–Mart. She continued to work at Wal–Mart and earned $4,894.62 through October 2005.[5] The record contains no further earnings information for Harford.

### B. Administrative Hearing Testimony

#### 1. Harford's Testimony

At the administrative hearing, the ALJ and Harford had the following discussion about her job at Wal–Mart:

Q: Okay. Are you able to do your job at Wal–Mart?

A: Yeah. I have some trouble. I have a hard time concentrating when I think I'm doing a good job they give me a white paper telling me that I either forgot to do this, like look for a signature on your check, or I put something wrong in the register, or certain type of people come through my line and I start having panic attacks.

(Administrative Record at 373.) Harford's attorney asked Harford to elaborate on her difficulties with concentration, understanding, and memory. Harford indicated that reading is difficult because she has difficulty understanding the words and quickly forgets what she has read. Harford further described her difficulties with memory as follows:

A: Well, my husband has to remind me to take a shower because I forget. He has to remind me, if I start to cook, to go out and check stuff so I don't burn [it]. And half the time I don't do so good so he does the cooking. He has to remind me to go in and like put my laundry in the laundry basket and stuff like that so the house ain't a mess.

Q: And when you weren't married or weren't with, living with anybody were things a lot different?

A: Yeah. My house was always messy and I didn't smell too good.

(Administrative Record at 376–77.)

Harford's attorney asked Harford whether she was seeing any medical professionals for treatment of her mental health issues. Harford replied that she had been meeting with a psychiatrist for help with her nightmares, flashbacks, and panic attacks.[6] The psychiatrist treated her with Hydroxy and Cymbalta. Harford testified that the medications help, but she still has panic attacks. According to Harford, her psychiatrist thought that she was doing okay, but could be doing better. Her psychiatrist's goal was to make her anxiety and panic attacks less severe.

Next, Harford's attorney asked Harford about her work capabilities:

Q: Okay. The amount of work that you're doing now is, is that about the most you can work or do you think you could work more? Are you at your maximum as far as the number of hours you can get?

A: That's pretty much the maximum but I noticed too [sic] myself that, like if I work like two days in a row and have like two or three days off I'm fine. But if I have to work more than two days in a row and then have a day off, it's kind of hard because it's like kind of over stressful on me.

---

5. See Id. at 101, 370–71.

6. Harford's nightmares and flashbacks stem from multiple incidents of sexual abuse when she was a child. See Administrative Record at 374–76.

(Administrative Record 379.) Lastly, Harford's attorney asked Harford to describe a typical day when she did not work:

Q: When you're not working what do, how do you handle your day? What do you do?

A: I watch TV, sit around, kind of daydream.

Q: Do you sleep a lot?

A: Yeah. I sleep a lot.

Q: Out of 24 hours how many hours do you sleep?

A: If I don't work, probably between night time and day time. Probably 12 to 16.

Q: Does your husband expect you to do anything around the house at all?

A: Yeah. He, you know, he expects me to help out by, you know, picking up stuff and help with the laundry once in a while and, you know, what I can but if I don't do it he's, he's pretty, he's been, you know, pretty cooperative with me and, you know, reminding me. . . .

(Administrative Record at 381–82.)

### 2. Vocational Expert's Testimony

At the hearing, the ALJ asked Harford's attorney whether he had a hypothetical question he wanted to ask the vocational expert. Harford's attorney provided the vocational expert with a hypothetical based on Harford's psychiatrist's assessment of her mental faculties:

. . . [Harford] would be seriously limited but not precluding [sic] from doing unskilled work in the following areas, maintain attention for two hour segments, work in coordination with others without being completely distracted, . . . complete [a] normal . . . work day and work week without interruptions from psychologically based symptoms, accept

instructions and respond to criticism, get along with coworkers, and in, as far as semi-skilled work, set realistic goals, [and] make plans independently. [Harford's psychiatrist] doesn't think she'd be able to meet competitive standards in a lot of different areas in an unskilled level indicating, remembering work like procedures, understanding and remembering simple instructions, carrying out very short and simple instructions.

(Administrative Record at 388–89.) The vocational expert testified that under such limitations, Harford would be unable to find competitive employment. Harford's attorney added further limitations based on Harford's psychiatrist's assessment, including "marked impairment in difficulty maintaining social functioning, marked [deficiency in] concentration, persistence in pace, and three or more repeated episodes of decompensation within a 12 month period." [7] Again, the vocational expert testified that under such limitations, Harford would be unable to find competitive employment. The ALJ asked the vocational expert whether she thought that if the limitations suggested by Harford's psychiatrist were true, Harford could maintain her cashier job at Wal–Mart. The vocational expert opined that under such limitations, she would not be able to maintain her Wal–Mart cashier job. The record does not contain any other hypothetical questions.

### C. Harford's Medical History

On September 16, 2003, Harford was evaluated by Dr. Roger E. Mraz, Ph.D., for a psychological report for Disability Determination Services ("DDS"). Dr. Mraz's report provides a detailed history of Harford's personal and psychological history as reported by Harford and Steven Harford ("Steven").[8] Harford grew up in

---

7. *See* Administrative Record at 389.

8. When Harford met with Dr. Mraz in 2003, she was not married to Steven Harford. Ste-

Mason City, Iowa, and lived with her mother, stepfather, and two half-sisters. According to Harford, her mother dropped her down a flight of stairs when she was eighteen months old. Dr. Mraz noted that he was not provided with any medical records to assess the severity of Harford's head injury.

Harford reported that she had difficulty in school and was diagnosed with a learning disability at an early age. Dr. Mraz noted that "[s]he began receiving special education support, and was later diagnosed as Mentally Disabled. She also received speech and language services during her elementary school years." [9]

Harford also reported that she was sexually abused by her stepfather when she was twelve years old. She also informed Dr. Mraz that she was raped when she was thirteen. She believed that her stepfather arranged the rape. Harford stated that she informed her mother about her stepfather's sexual abuse, but her mother refused to believe her. She further reported that she did not inform the authorities that she was sexually abused because her stepfather threatened to kill her if she contacted the authorities. Both Harford and Steven reported that Harford suffers from flashbacks, nightmares, and distressing recollections of her sexual abuse. Dr. Mraz noted that Harford "startles easily, has difficulty concentrating, and her sleep is frequently interrupted with nightmares." [10] Dr. Mraz further noted, however, that Harford's "responses to the Beck's Depression Inventory, were not suggestive of a major depressive disorder." [11]

Dr. Mraz also reviewed Harford's marital history. Dr. Mraz noted that she met Michael LaPlat when she was seventeen. Dr. Mraz further noted that:

[She] left home to be with [LaPlat]. They lived together for awhile, and eventually married. The relationship produced three children. [Harford] reported that [LaPlat] was abusive, and they were eventually divorced. She then married Kelly Brannaman, and this relationship produced one child. However, [Harford and Brannaman] are currently in the final stages of a divorce, and [Harford] moved in with Steve Harford and his wife about 1 year ago. [Harford's] first child was given up for adoption, and her second child is currently in a foster home. [Her] third child is living with Mr. Brannaman and his mother. Her fourth child is living with [her] and the Harford's.[12]

(Administrative Record at 178–79.)

Upon examination, Dr. Mraz determined that Harford scored 25 out of 30 on the "Mini–Mental State Exam." Specifically, Dr. Mraz found that Harford:

was well oriented X 3, and had no difficulty with immediate or delayed recall. She did have difficulty focusing her attention, concentrating, and remembering things. She had difficulty holding information in memory long enough to use it for another purpose, such as doing mental computations. She could read and write at a functional adult level, and could follow three directions in their proper sequence. Visual motor integration skills were poor. With her poor working memory skills, [Harford] had

ven attended the evaluation as Harford's friend. They were married in December 2004.

**9.** *See* Administrative Record at 178.

**10.** *Id.* at 179.

**11.** *Id.*

**12.** The record provides that Harford's fourth child was placed in foster care in May 2005. *See* Administrative Record at 368–69.

difficulty adding up money and making change correctly.

(Administrative Record at 179.) Dr. Mraz opined that Harford functioned at the upper end of the mild range for mental retardation. Dr. Mraz concluded that:

> Overall, the results of the evaluation suggest [Harford] is not functioning in an age appropriate manner cognitively, or in any of the adaptive behavior domains. By history, [Harford] has never been successfully employed for any length of time, having difficulty caring [sic] out even simple tasks like dishwashing. [Harford] does take care of her own hygiene needs, household chores, and shopping, but does seem to need help with decision making. While depression does not seem to be a major issue, [Harford] does seem to be suffering significant symptoms of Posttraumatic Stress Disorder.

(Administrative Record at 181.)

On October 20, 2003, Dr. Lon Olsen, Ph.D., reviewed Harford's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for Harford. On the Psychiatric Review Technique assessment, Dr. Olsen diagnosed Harford with borderline intellectual functioning and anxiety disorder. Dr. Olsen determined that Harford had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Olsen determined that Harford was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and travel in unfamiliar places or use public transportation. In addition, Dr. Olsen disagreed with Dr. Mraz's diagnosis of mild mental retardation. Dr. Olsen opined that Dr. Mraz's diagnosis was not supported by his psychological "report which, in fact, identifies a number of [Harford's] capabilities. Furthermore, it is not consistent with her history of work ... and with the fact that she completed a GED in 1998."[13] Dr. Olsen concluded that Harford has a medically determinable impairment:

> but it would not prevent her from performing work-like activities. She is independent for all self-cares, performs a variety of daily activities, interacts with others on a superficial basis, and engages in purposeful activity when motivated to do so.... She would have some difficulty, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, and traveling in unfamiliar areas. She would be capable of activities that did not require attention to detail, sustained vigilance, or travel in unfamiliar areas.

(Administrative Record at 182.)

On January 15, 2004, Dr. John F. Tedesco, Ph.D., reviewed Harford's medical records and provided DDS with two Psychiatric Review Technique assessments, one for the time period of April 1988 to June 1989, and one for the time period of December 2001 to January 2004. Dr. Tedesco also provided DDS with two mental residual RFC assessments for the same time periods for Harford. On the Psychiatric Review Technique assessment for April 1988 to June 1989, Dr. Tedesco diagnosed Harford with borderline intellectual functioning, personality disorder[14], and substance

---

13. *See* Administrative Record at 182.

14. Dr. Tedesco indicated that Harford's personality disorder was evidenced by oddities of thought, perception, speech, and behavior, pathological dependence, passivity, or aggressivity, and intense and unstable interpersonal

abuse disorder. Dr. Tedesco determined that Harford had the following limitations: moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment from the April 1988 to June 1989, Dr. Tedesco determined that Harford was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Tedesco also determined that Harford was markedly limited in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

On the Psychiatric Review Technique assessment for December 2001 to January 2004, Dr. Tedesco diagnosed Harford with borderline intellectual functioning and anxiety disorder. Dr. Tedesco determined that Harford had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social func-

tioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment for December 2001 to January 2004, Dr. Tedesco determined that Harford was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and travel in unfamiliar places or use public transportation. Dr. Tedesco concluded:

> [Harford] alleges an inability to work based on her mental condition. Evidence does not support the existence of marked functional impairments. This conclusion is based on the following observations. [Harford] has not sought treatment for any mental health difficulty in the recent past.... Her activities of daily living do not appear to be markedly limited by her mental capacity. She seems capable of performing adequately when properly motivated.

(Administrative Record at 229–30.)

On April 19, 2004, Harford visited Dr. Dwight J. Schroeder, M.D., for a comprehensive psychiatric evaluation. She complained of depression, having regular flashbacks, and nightmares. Dr. Schroeder noted that at the time of the evaluation, Harford was:

> having mood swings.... Her mood is down, sleep is generally okay with nightmares. Appetite is down some. Energy is down. Motivation is down. Interest is down some. Concentration is so-so and memory is down. She admits to occasional crying spells, some hopelessness, some social isolation, irritability and excess worrying. She denies any worthlessness, guilt, [or] trouble making decisions[.] ... She is extremely nervous and anxious at times, [and] is afraid to be out in the public eye.

relationships and impulsive and damaging be-

havior. *See* Administrative Record at 206.

(Administrative Record at 245.) Upon examination, Dr. Schroeder found that Harford's mood was depressed and affect restricted. Dr. Schroeder also found that her recent memory was fairly good, but her psychomotor activity was decreased. Dr. Schroeder diagnosed her with major depressive disorder and posttraumatic distress disorder ("PTSD"). Dr. Schroeder recommended follow-up appointments, Imipramine, and Lexapo as treatment.

Harford had regular follow-up appointments with Dr. Schroeder from May 21, 2004 through August 22, 2005.[15] Dr. Schroeder's progress notes generally showed that Harford's mood and affect were down at the appointments. Dr. Schroeder's progress notes also showed that her cognition and memory were generally "OK" or down. On July 15, 2005, Dr. Schroeder's progress notes showed an improvement in mood and affect. The July 2005 progress note also provided that Harford's cognition and memory were "OK." On August 22, 2005, Dr. Schroeder's progress report provided that Harford's mood and affect were down some and her cognition and memory were "OK." [16]

On September 24, 2004, Dr. Schroeder filled out a mental impairment questionnaire provided by Harford's attorney. At the time he filled out the questionnaire, Dr. Schroeder had visited with Harford on three occasions. Dr. Schroeder diagnosed Harford with major depressive disorder and PTSD. Dr. Schroeder identified the following signs and symptoms for Harford's mental impairments: anhedonia, pervasive loss of interest in almost all activities, appetite disturbance with weight change, decreased energy, blunt, flat, or inappropriate affect, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, psychomotor agitation or retardation, persistent disturbances of mood or affect, apprehensive expectation, autistic thinking, emotional lability, vigilance and scanning, memory impairment, sleep disturbance, emotional withdrawal, and persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation. Dr. Schroeder determined that Harford was seriously limited, but not precluded from: maintaining attention for a two hour segment, working in coordination with or proximity to others without being unduly distracted, being able to complete a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, setting realistic goals or making plans independently of others, interacting appropriately with the general public, and maintaining socially appropriate behavior. Dr. Schroeder also determined that Harford was unable to meet the competitive standards for: remembering work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in a routine work setting, dealing with normal work stress, understanding and remembering detailed instructions, carrying out detailed instructions, and traveling in unfamiliar places. Dr. Schroeder further determined that Harford had the following limitations: moderate restriction of activities of daily

---

15. *See* Administrative Record at 236–44.

16. The August 2005 progress note is the last progress note from Dr. Schroeder contained in the record.

living, marked difficulties in maintaining social functioning, and marked deficiencies in maintaining concentration, persistence, or pace. Additionally, Dr. Schroeder found that Harford did not have a low IQ. Lastly, Dr. Schroeder opined that Harford's impairments would cause her to be absent more than four days per month from work.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

█ The ALJ determined that Harford is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Page v. Astrue,* 484 F.3d 1040, 1042 (8th Cir.2007); *Anderson v. Barnhart,* 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir.2005) (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir.2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not

disabled." *Eichelberger,* 390 F.3d at 590–91 (citing *Ramirez v. Barnhart,* 292 F.3d 576, 580 (8th Cir.2002)).

█ "To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. " 'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.' " *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir.2005) (quoting *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir.2001)).

The ALJ applied the first step of the analysis and determined that Harford had not engaged in substantial gainful activity since December 15, 2001.[17] At the second step, the ALJ concluded from the medical evidence that Harford had the following severe combination of impairments: depression and posttraumatic stress disorder. At the third step, the ALJ found that Harford did not have an impairment or combination of impairments listed in "20

---

17. The Court notes that prior to the administrative hearing, Harford amended her disability onset date to December 15, 2001 from June 1, 2003. At the administrative hearing, however, Harford again amended her disability onset date to June 6, 2003. *See* Administrative Record at 364. Regardless of the date provided by the ALJ, it is clear that the ALJ found Harford was not engaged in substantial activity from her disability onset date of June 6, 2003.

C.F.R. [§ ] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments) ]." At the fourth step, the ALJ determined Harford's RFC as follows:

> [Harford] has moderate limitations in her ability to remember, understand, and carry out detailed or complex instructions, maintain attention and concentration for extended time periods, and travel in unfamiliar places, but should otherwise be able to function within normal limits and to perform unskilled work tasks.

(Administrative Record at 25.) Using this RFC, the ALJ determined that Harford could perform her past relevant work as a cashier and production worker. Therefore, the ALJ concluded Harford was "not disabled."

### B. Objections Raised by Claimant

Harford contends that the ALJ erred in four respects. First, Harford argues that the ALJ erred by "requiring affirmative support for Dr. Schroeder's opinions in his treatment notes rather than looking at whether the record as a whole was 'not inconsistent' with Dr. Schroeder's opinions." [18] Second, Harford argues that the ALJ's decision to discount Dr. Schroeder's opinions is not supported by substantial evidence in the record. Third, Harford argues that the ALJ's conclusion that she does not have borderline intellectual functioning is not supported by substantial medical evidence. Lastly, Harford argues that the ALJ failed to fully and fairly develop the record with regard to her functional limitations.

18. *See* Harford's Brief at 10.

19. The Court will address Harford's first two arguments together because both arguments concern the opinions of Dr. Schroeder.

20. The "not inconsistent" standard referred to by Harford, stems from 20 C.F.R. § 404.1527(d)(2) which states in pertinent part:

### 1. Dr. Schroeder's Opinions [19]

 Harford argues that the ALJ "misstated and misapplied" the law by affording Dr. Schroeder's opinions presented in the mental impairment questionnaire "little weight" because those opinions were not supported by his treatment notes. According to Harford, the ALJ should have applied the "not inconsistent" standard instead of the "not supported" standard when weighing Dr. Schroeder's opinions against the record as a whole. [20] Specifically, Harford argues that:

> Here, the ALJ stated Dr. Schroeder's opinions were 'not supported by' his treatment notes. The ALJ has turned the standard on its head and imposed a higher bar than allowed. The ALJ's decision is based on the wrong standard. The ALJ failed to state and apply the proper standard—the 'not inconsistent' standard.

(*See* Harford's Brief at 13.) Harford also argues that the ALJ's decision to discount Dr. Schroeder's opinions is not supported by substantial evidence.

 An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir.2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an

> ... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight....

*Id.*

applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh,* 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001) (citing *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir.2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.; see also Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003) (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir.2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen,* 881 F.2d 561, 564 (8th Cir.1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In discussing Dr. Schroeder's opinions, the ALJ found that:

Dr. Schroeder's opinions are not supported by his objective treatment notes and intake evaluation, which generally documented improved mood, sleep, and interest, lack of suicidal ideation, low average intellectual functioning, and acceptable psychomotor activity, insight, judgment, cognition, and memory, and logical goal directed thought processes. [Harford] told Dr. Schroeder that flashbacks occurred only occasionally. [Harford] returned to work as a cashier at Wal–Mart for 20 to 35 hours a week, and divorced and remarried while seeing Dr. Schroeder, showing that she was capable of initiating actions and adjusting to change. [Harford] told Dr. Schroeder that she had received a fairly good evaluation at Wal–Mart, showing that she is able to sustain adequate concentration and attention at work, deal with customers, coworkers, and supervisors, lean work tasks, and maintain acceptable work attendance. Dr. Schroeder's proposed work restrictions are not supported by his objective findings and therefore, are not entitled to controlling weight.

Dr. Schroeder's opinion was issued after he had seen [Harford] only 3 times and did not reflect a longstanding treatment relationship. The undersigned asked the vocational expert whether the restrictions proposed by Dr. Schroeder would permit [Harford] to perform her current job as a Wal–Mart cashier. The vocational expert confirmed that these limitations were not consistent with [Harford's] current work activity, which included superficial public dealings, ac-

cepting payment for goods, providing change, scanning codes, and sometimes bagging retail items. Because Dr. Schroeder's proposed limitations were not based upon a longstanding treatment relationship and are contradicted by [Harford's] actual work activity, they have not been given significant or substantial weight in determining the impact of [Harford's] mental disorder.

(Administrative Record at 27.)

The ALJ assessed the entire record and determined that Dr. Schroeder's opinions in the mental impairment questionnaire were inconsistent with the record as a whole. *See Travis*, 477 F.3d at 1041; 20 C.F.R. § 404.1527(d)(2). Specifically, the ALJ found that Dr. Schroeder's treatment notes and intake evaluation did not support his opinions on the mental impairment questionnaire. The only conclusion to be drawn from such a finding is that Dr. Schroeder's opinions in the mental impairment questionnaire were inconsistent with his treatment notes and intake evaluation. Thus, Harford's argument that the ALJ "misstated and misapplied" the law is without merit. Additionally, the ALJ provided both detailed and "good reasons" for giving Dr. Schroeder's opinions in the mental impairment questionnaire little weight. *See* 20 C.F.R. § 404.1527(d)(2) (an ALJ must give "good reasons" for rejecting the opinions of a treating physician). Furthermore the ALJ's decision both specifically and generally points out inconsistencies with Dr. Schroeder's opinions and the record as a whole. *See Vester*, 416 F.3d at 889; *see also Edwards*, 314 F.3d at 967 (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); *Strongson*, 361 F.3d

at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record). Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. Harford's Intellectual Functioning

■ Harford argues that the ALJ's determination that "[t]he evidence does not support a diagnosis of borderline intellectual functioning"[21] is not supported by substantial evidence. First, Harford points out that the ALJ's decision "is internally inconsistent" because in her decision, the ALJ found that Harford has "medically determinable severe impairments of depression, post traumatic stress disorder, and borderline intellectual functioning."[22] In a footnote, the Commissioner suggests that "the ALJ included borderline intelligence as a severe impairment, but this appears to be a clerical or drafting error because the ALJ clearly indicates thereafter that she considered [Harford] to have low normal intelligence."[23] The Court agrees with the Commissioner that the ALJ's inclusion of borderline intellectual functioning as a severe impairment in the body of her decision is a clerical or drafting error for the reason articulated by the Commissioner, and because in the findings of fact section of the decision, the ALJ determined under the second step of the five-step sequential analysis, that Harford only "has severe impairments of depression and post traumatic stress disorder."[24]

---

21. *See* Administrative Record at 28.

22. *Id.* at 22.

23. *See* Commissioner's Brief at 4.

24. *See* Administrative Record at 20 (Findings of Fact number 3 in bold).

Furthermore, the ALJ's decision provides:

> The most recent IQ scores indicated mild mental retardation. Although Dr. Mraz considered these scores valid and consistent with adaptive deficits, it was noted that Dr. Mraz' information regarding adaptive deficits came from [Harford] and Steven Harford, both of whom had a biased interest in showing that [Harford] was disabled. In addition, [Harford] misrepresented information to Dr. Mraz, such as misrepresenting her work history. . . . She told Dr. Mraz that she had difficulty adding money and making change, yet Steven Harford reported that [Harford] is able to pay bills, count change, handle bank accounts, use a checkbook/money order, and grocery shop. [Harford's] work history as a cashier documents at least adequate ability to handle money and make change. [Harford] has obtained a driver's license and is able to navigate the public transportation system without assistance. She has also obtained a high school equivalency degree. Although testing by Dr. Mraz indicated that [Harford] could only read and write at an upper elementary level, testing in January[ ] 1993 showed that [Harford] had above high school level reading ability. While undergoing marital counseling in 2000, [Harford] was noted to have adequate insight and judgment and intact memory. The State agency medical consultants confirmed that the IQ scores obtained by Dr. Mraz are not consistent with [Harford's] actual level of cognitive functioning.

> Furthermore, previous IQ scores have been at much higher levels. Testing by the school system in 1979 revealed a Verbal IQ of 79, a Performance IQ of 72, and a Full Scale IQ of 74. Testing in 1991 revealed average intellectual functioning and IQ testing in January[ ] 1993 showed a Verbal IQ of 87, Performance IQ of 83, and a Full Scale IQ of 84. This testing was considered valid and indicative of average intellectual functioning and was supported by other test results showing above 12th grade reading ability, 8th grand level spelling level, and sixth grade arithmetic level. Dr. Schroeder confirmed that [Harford] did not exhibit low IQ or reduced intellectual functioning, but had low normal cognitive ability.

> The undersigned concurs with the opinions of the State agency consultants that [Harford] has not demonstrated the adaptive deficits described by Dr. Mraz and that the IQ scores found by Dr. Mraz do not accurately reflect [Harford's] actual intellectual functioning. The overall evidence shows that [Harford] has low average intellectual functioning.

(Administrative Record at 22–23.) Having reviewed the entire record, the Court finds that the ALJ's determinations regarding Harford's intellectual functioning are "supported by substantial evidence on the record as a whole." *Vester*, 416 F.3d at 889. Even if inconsistent conclusions could be drawn on this issue, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. Development of the Record

Harford argues that the ALJ failed to adequately develop the record. Specifically, Harford argues that the ALJ did not fully and fairly develop the record with regard to her intellectual level, reading and writing level, ability to drive, and obtaining the GED. The Commissioner responds that Harford's argument is without merit because she fails to "explain why further development is necessary on these issues when the ALJ found that she could perform past relevant work—work that

she has successfully performed regardless of her IQ, reading/writing levels, or whether she has a driver's license."[25]

 An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir.2007); *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir.2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir.1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that " 'deserving claimants who apply for benefits receive justice.' " *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir.1994)). Having reviewed the entire record, the Court finds that the ALJ met her duty and fully and fairly developed the record in this case.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Schroeder. The ALJ also properly considered and developed the issue of Harford's intellectual functioning. Lastly, the ALJ fully and fairly developed the record in this case. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED:**

1. The final decision of the Commissioner of Social Security is **AFFIRMED;**

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

25. *See* Commissioner's Brief at 12.

3. The Clerk of Court is directed to enter judgment accordingly.